Melynda J. COLBERT, Plaintiff,

v.

GEORGIA-PACIFIC CORPORATION,
Rob Williams, and Bill Coley,
Defendants.

No. 7:96–CV–283–X.

United States District Court,
N.D. Texas,
Wichita Falls Division.

Jan. 30, 1998.

Dean Andrew Sanders, Law Office of Dean A Sanders, Wichita Falls, TX, Leslie F Hatch, Craig, Terrill & Hale, ·Lubbock, TX, for Melynda J Colbert.

Arlene Switzer Steinfield, David Michael Pryor, Thompson & Knight, Dallas, TX, for Georgia–Pacific Corp, Rob Williams, Bill Coley, Defendants.

Cynthia Solls, Law Office of Cynthia Solls, Dallas, TX, pro se.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Before the Court is the Defendants' Motion for Summary Judgment, filed November 20, 1997; Plaintiff's Response, filed December 10, 1997 and Amended Response, filed December 23, 1997; and Defendants' Reply, filed January 7, 1998. After carefully considering the motion, briefs, supporting evidentiary submissions, and applicable law, the Court determines that no issues of material fact exist with respect to the issues raised in the motion for summary judgment. Therefore, Defendants' Motion for Summary Judgment is GRANTED.

### BACKGROUND

This is a sexual harassment case. Plaintiff Melynda J. Colbert began working for Defendant Georgia–Pacific Corporation at its wallboard manufacturing facility in Acme, Texas in November 1994. Colbert went through an orientation when she was hired that included a video presentation on sexual harassment. The video instructed employees on the procedures for complaining about sexual harassment, and the law on it. Employees were instructed to immediately notify a supervisor or manager if they felt they were being subjected to sexual harassment. In addition, employees were given an 800 number to call to report sexual harassment. The video specifically stated that Georgia–Pacific did not tolerate or condone sexual harassment of any kind in the workplace. Georgia–Pacific's sexual harassment policy was also posted in the plant. Colbert signed a form on November 18, 1994 that indicated she had been through the company training on sexual harassment.

For the first 45 days of her employment at the Georgia–Pacific plant, Colbert was a "red hat" or probationary employee. As a red hat, Colbert was not assigned to any particular supervisor, but was a floater doing whatever tasks were assigned to her that day. After her time as a red hat, Colbert worked as an unloader/inspector on the take-off crew. Colbert's duties included inspecting wallboard for defects and operating machinery to unload wallboard from the production

line. The unloader is a difficult piece of machinery to operate, and it would occasionally jam and cause production to stop while it was being repaired. Bill Coley was the leadman of her crew and shift foreman Dwayne Dishman was her immediate supervisor in that position. Dishman reported to Harlow Dodge, the Board Plant Supervisor. Dodge reported to Plant Manager Stan Asbell.

Colbert testified in her deposition that Coley initially made comments to Colbert complementing her on her appearance that she did not find inappropriate. Later, Coley approached Colbert numerous times, telling her she could make $500 a day working for him entertaining a Japanese mafia gambling group that came through Wichita Falls. Coley would say that Colbert had the body and face and was too classy to be working at the plant. She would have to wait on the Japanese men and wear skimpy clothes but she wouldn't have to "do anything" with them if she didn't want to.

Colbert testified that when Colbert let Coley know that she was offended by this talk, Coley told her that she already knew too much and that she could be in danger. Coley said that a black girl had turned him in who had worked for him, and she disappeared and nobody had seen her since. Colbert asked around the plant and other workers told her that a black girl had worked there, had problems with Coley, and had never returned to work. Coley would also come up behind Colbert and rub his chest against her back in a way that an observer would think that he was merely assisting her with her machine.

On April 24, 1995, Colbert stated that Coley told her that he was going to have her "iced." When she asked what that meant, Coley told her he could have her killed. Colbert was frightened and crying and another supervisor, Ray Kovacsiss, asked her what was wrong. She asked Kovacsiss to leave because she didn't want Coley to see them talking. Later that evening, Kovacsiss returned out of concern and found that Colbert had a problem with Coley. Kovacsiss immediately reported it to plant management

A few minutes later, Colbert was called into the office to speak with Plant Manager Asbell and Board Plant Superintendent Dodge. When Colbert told them what had been going on with Coley, Asbell was very understanding and quick to get to the bottom of her problem. When Colbert expressed fear about going home, Asbell offered to have a secretary take her because she was so upset. Colbert declined and had her roommate follow her home. Until April 24, 1995, Colbert had not told any Georgia–Pacific supervisor or manager about Coley's sexually harassing conduct. That night, Dodge and Dishman interviewed Coley. Although Coley maintained he had not engaged in the behavior Colbert alleged, Coley was suspended.

The following afternoon, Colbert had another meeting with Asbell, Dodge, and Assistant Plant Manager Bill Rasnick. Colbert was offered union representation but she declined it. This interview was taped, and Colbert signed a transcript of the interview tape. The managers told Colbert that the company took this matter very seriously, and that they were going to investigate it promptly. Colbert agreed in her deposition that she was treated in the interview with the utmost respect without any hint of retaliation. Colbert gave the managers the names of people who had witnessed the incidents with Coley, and the company interviewed each of them. These interviews with Frank Vargo, Donna Alston, Roy Quisenberry, James Doyal, and Bill Cooper corroborated many of Colbert's allegations.

As a result of Georgia–Pacific's investigation, the company terminated Coley's employment on May 4, 1995. He never worked another shift at the plant after Colbert's complaint on the night of April 24, 1995. Asbell instructed a Georgia–Pacific employee to help Colbert file a criminal complaint against Coley.

Colbert returned to work the day after she made her complaint, but left because of stress. Colbert was subsequently admitted to the hospital after she began having seizures because of stress. After she was released to return to work, Colbert returned to the plant and told Personnel and Safety Manager Rob Williams that she was not going to return to her job, but was going to move home to Lubbock to help her family. Colbert resigned effective August 25, 1995.

Colbert filed this lawsuit on December 3, 1996. Colbert's Complaint asserts causes of action for sexual harassment in violation of Title VII[1] and the Texas Commission on Human Rights Act,[2] and under Texas common law for intentional infliction of emotional distress, negligence, and assault and battery. Defendant Coley failed to answer Colbert's Complaint, and the Court granted a default judgment against Coley on April 10, 1997. Defendants Georgia–Pacific and Williams have moved for summary judgment, asserting that no genuine issue of material fact exists on the essential elements of each of Colbert's causes of action so that they are entitled to judgment as a matter of law.

## SUMMARY JUDGMENT

Summary judgment is proper when the pleadings and evidence illustrate that no genuine issue exists as to any material fact and that the movant is entitled to judgment or partial judgment as a matter of law. Fed. R.Civ.P. 56(c); *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir.1991). Disputes concerning material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Substantive law provides that an issue is "material" if it involves a fact that might affect the outcome of the suit under the governing law. *Burgos v. Southwestern Bell Telephone Co.*, 20 F.3d 633, 635 (5th Cir.1994); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and wait for trial. *Page v. DeLaune*, 837 F.2d 233, 239 (5th Cir.1988).

When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir.1992); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden," *Douglass*, 79 F.3d at 1429, as "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Merely colorable evidence or evidence not significantly probative, however, will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Furthermore, a mere scintilla of evidence will not defeat a motion for summary judgment. *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir.1994); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Summary judgment evidence is viewed in the light most favorable to the party opposing the motion. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir.1993); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). In addition, factual controversies are resolved in favor of the nonmovant, but only when both parties have submitted evidence of contradictory facts, thus creating an actual controversy. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). In the absence of any proof, however, the Court does not assume that the nonmovant could or would prove the necessary facts. *Id.*

In making its determination on the motion, the Court looks at the full record including the pleadings, depositions, answers to interrogatories, admissions, and affidavits. Fed. R.Civ.P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir.1988). However, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The movant's motion for summary judgment will be granted if he meets

1. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2. Tex. Lab.Code Ann. § 21.001 *et seq.* ("TCHRA").

his burden and the nonmovant fails to make the requisite showing that a genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c); *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1119 (5th Cir.1992).

## DISCUSSION

■ As noted above, Colbert asserts causes of action for sexual harassment in violation of Title VII and the TCHRA. The Texas Supreme Court has observed that, as Texas courts have had little opportunity to interpret the TCHRA, it is appropriate to seek guidance from cases interpreting Title VII. *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex.1996); *Speer v. Presbyterian Children's Home and Serv. Agency*, 847 S.W.2d 227, 232 (Tex.1993) (Gonzalez, J., concurring). Indeed, one of the general purposes of the TCHRA is "to provide for the execution of the policies embodied in Title VII ..." Tex. Lab.Code Ann. § 21.001(1); *City of Austin v. Gifford*, 824 S.W.2d 735, 738–39 (Tex.App.—Austin 1992, no writ). The TCHRA correlates state law with federal law in the area of employment discrimination. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex.1991). The applicable law governing Colbert's state law claims under the TCHRA and claims under Title VII is thus identical. Colbert also asserts causes of action under Texas common law for intentional infliction of emotional distress, negligence, and assault and battery.

## Individual Liability of Rob Williams

■ Colbert has sued Personnel and Safety Manager Rob Williams in his individual capacity on her Title VII and state law claims. In her deposition, Colbert stated that she was angry because Williams had posed several questions to her fellow employees Bill Cooper and Frank Vargo during his investigation of her complaint. Williams had asked the other men whether Colbert had been provocative or flirtatious with Coley. Colbert was told by a co-worker that Williams had asked other employees whether Colbert was sexually provocative toward them. Colbert believed that Williams was trying to find a way to justify Coley's conduct, but when he couldn't find a way to do so, Williams finally had to repudiate Coley's conduct.

■ Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). Section 2000e(b) defines "employer" as "a person engaged in an industry or commerce who has fifteen or more employees ... and any agent of such a person." The term "person" includes one or more individuals. 42 U.S.C. § 2000e(a). Title VII does not permit the imposition of liability upon individuals, even those functioning in a management capacity, unless they meet the definition of "employer" under Title VII. *Grant v. Lone Star Co.*, 21 F.3d 649, 652–53 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994). Colbert has submitted no evidence to establish that Rob Williams qualifies as her "employer" so that he may be held individually liable for sexual harassment under Title VII or the TCHRA. "Among the various parties subject to liability in [Title VII], Congress could have made the individual employee committing or engaging in the discriminatory acts liable for damages. It did not." *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994). The Court concludes that summary judgment for Rob Williams is proper on Colbert's Title VII and TCHRA claims.

## Sexual Harassment

A hostile work environment claim arises when a plaintiff alleges sexual harassment that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). Whether a working environment is "hostile" or "abusive" can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114

S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). The test is an objective one.

To establish an actionable claim of hostile work environment sexual harassment, a plaintiff must demonstrate: 1) that she belongs to a protected class; 2) that she was subject to unwelcome sexual harassment; 3) that the harassment was based on sex; 4) that the harassment affected a term, condition or privilege of employment; and 5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action. *Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir.1996); *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Whether an employer's response to discriminatory conduct is sufficient "will necessarily depend on the particular facts of the case— the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 399–400 (5th Cir.1996), *quoting Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989).

■ Colbert has failed to establish an actionable sexual harassment case because she has not raised a genuine issue of material fact as to the fifth element: that Georgia–Pacific knew or should have known of the harassment and failed to take prompt remedial action. In her brief, Colbert argues that Georgia–Pacific knew or should have known that Coley engaged in sexual harassment towards her because Coley had engaged in similar conduct toward two other Georgia–Pacific employees, Gwendolyn Mayberry and Donna Alston. The two taped interviews conducted by Georgia–Pacific with Alston just after Colbert's complaint confirm that Coley made vague claims to Alston that she could make more money doing something else, but he was never specific. Alston never said anything to her supervisor or other Georgia–Pacific management about Coley's comments.

Colbert submits the affidavit of Mayberry, who stated that Coley made numerous sexual advances towards her while at work, telling her that he could advance her within the company if she cooperated with him, and threatening her with losing her job if she didn't cooperate. Mayberry's affidavit also states that she reported Coley's actions to Rob Williams, but she was never requested to give a statement, never saw anything to indicate that the company conducted an investigation, and she was terminated three days later. It was Mayberry's impression that she was terminated because of her complaint about Coley.

Mayberry testified in her deposition that she worked for Georgia–Pacific less than a month, from September to October of 1993. She was a "red hat" unloader/inspector in her 90 day probationary period when she was terminated. Williams told her she was being terminated because of the boards jamming when she was operating the machinery. Mayberry acknowledged that the machine had jammed on her last day. Mayberry doesn't know whether or not the company undertook an investigation of her sexual harassment complaint. She cannot remember whether the company went over its sexual harassment policy with her during orientation. She signed a paper saying she received EEO training, but she can't remember if Georgia–Pacific's sexual harassment policy was discussed.

The question of what constitutes constructive notice by an employer of an employee's sexual harassment has not been fully resolved in the Fifth Circuit. A plaintiff can demonstrate constructive notice by "showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Waltman v. International Paper Co.*, 875 F.2d 468, 478 (5th Cir.1989). In *Waltman*, the Fifth Circuit held that the plaintiff had raised a fact issue of the company's constructive notice of her sexual harassment because of her testimony that there was sexual graffiti directed at her in numerous locations. In *Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803, 806–07 (5th Cir.1996), the Fifth Circuit held that the plaintiff had presented sufficient evidence to support the jury's finding that the employer knew or should have known about the harassment because the plaintiff complained to two human resources directors about her harasser, and the harasser made many egregious comments to the plaintiff in front of co-workers.

In this case, Colbert argues that because Georgia–Pacific knew of Mayberry's complaints about Coley eighteen months before Colbert's complaint, that the company had constructive notice that *Colbert* was being sexually harassed. As the Fifth Circuit explained in *Pfau v. Reed,* 125 F.3d 927, 939–40 n. 10 (5th Cir.1997), in the cases that have held employers liable on the basis that the pervasiveness of sexual harassment implies constructive knowledge, the pervasive conduct *is the conduct of which the plaintiff complains. See Sharp v. City of Houston,* 960 F.Supp. 1164, 1170–71 (S.D.Tex.1997) (plaintiff raised a fact issue as to the existence and pervasive nature of sexual harassment by demonstrating that the offensive incidents directed at her by her supervisors were out in the open for all to see).

Colbert conceded in her deposition that Coley never made sexual comments to her within earshot of other employees, and anyone observing him standing near her would simply think that he was assisting her with the machinery. Colbert acknowledged that she never witnessed Coley engaging in sexual harassment toward any other female at the Georgia–Pacific plant, and had no first-hand knowledge of Coley sexually harassing anyone else. Colbert was well aware of the extensive mechanisms that Georgia–Pacific had instituted to report sexual harassment, but Colbert chose not to avail herself of those procedures until April 24, 1995. Colbert has not presented evidence sufficient to raise a fact issue that the company should have know of Coley's sexual harassment *of Colbert* before she finally voiced her complaint to management.

Colbert's own deposition testimony contradicts her assertion that Georgia–Pacific failed to take prompt remedial action. Colbert acknowledged that it was Georgia–Pacific's policy to take sexual harassment complaints seriously and to investigate and remedy any alleged harassment promptly. She agreed that no member of management had done or said anything to her to cause her to be afraid of retaliation if she complained of sexual harassment.

Colbert also acknowledged that after she reported Coley's sexual harassment to Georgia–Pacific management on April 24, 1995, she never had to work with Coley again.

She knew that as a result of the company's investigation, Coley's employment with Georgia–Pacific was terminated. Colbert agreed that by sending Coley home the night of her complaint, interviewing her again the next day, and suspending Coley that night, Georgia–Pacific was responding to her allegations quickly. Colbert also conceded that by suspending and terminating Coley so that she never had to work with him again or be subjected to sexual harassment, Georgia–Pacific took prompt remedial action. She agreed that the company did everything it could to stop the harassment, and indeed, after April 24, 1995, no one at the job site made any offensive comments to Colbert or engaged in any sexually offensive conduct towards her.

The summary judgment evidence demonstrates that Georgia–Pacific took Colbert's complaint seriously and conducted a prompt and thorough investigation. The company quickly suspended Coley and terminated his employment at the conclusion of its investigation. The Fifth Circuit has concluded that other employers taking less drastic measures than termination of the harasser took prompt remedial action as a matter of law. *See Nash v. Electrospace System, Inc.,* 9 F.3d 401, 404 (5th Cir.1993) (management's prompt investigation and transfer of complainant to department away from harasser considered sufficient remedial response); *Pfau v. Reed,* 125 F.3d 927, 940–41 (5th Cir.1997) (management's reminder of sexual harassment policy and admonishment not to engage in sexually harassing conduct considered sufficient remedial response). Colbert has not adduced specific facts demonstrating that Georgia–Pacific failed to take prompt remedial action after her complaint, and the Court grants summary judgment in favor of Georgia–Pacific with respect to Colbert's sexual harassment claim.

**Intentional Infliction of Emotional Distress**

■ Colbert has also asserted a cause of action under Texas law for intentional infliction of emotional distress, alleging that Coley's conduct was extreme and outrageous, intentionally causing Colbert to suffer severe emotional distress. Colbert also contends

that Georgia–Pacific and Williams knew of prior similar incidents by Coley and failed to take appropriate action to properly address such behavior. Colbert alleges that Georgia–Pacific and Williams are liable for their ratification of Coley's conduct and the hostile environment he created.

■■■ The elements of a claim for intentional infliction of emotional distress in Texas are: 1) the defendant acted intentionally or recklessly; 2) the conduct was extreme and outrageous; 3) the defendant's actions caused the plaintiff emotional distress; and 4) the emotional distress suffered by the plaintiff was severe. *Mattix–Hill v. Reck,* 923 S.W.2d 596, 597 (Tex.1996); *Twyman v.. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Whether a defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery is a question of law for the Court to decide. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). As the Supreme Court of Texas has explained, liability for outrageous conduct should be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman* at 621, *quoting* Restatement (Second) of Torts § 46 cmt. d (1965).

The Court concludes that Colbert has failed to raise an issue of material fact that either Georgia–Pacific's actions or Williams's actions state a claim for intentional infliction of emotional distress. Colbert has failed to show that Georgia–Pacific acted intentionally or recklessly. Colbert's claim for intentional infliction of emotional distress is based on the same allegations as those underlying her claims of sexual harassment. Even conduct which may be illegal in an employment context may not be the sort of conduct constituting extreme and outrageous conduct. *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir.1993).

Colbert has presented no evidence in support of her allegation that Georgia–Pacific or Williams ratified Coley's behavior. It is clear that Georgia–Pacific did not authorize or direct Coley's acts of sexual harassment. Georgia–Pacific made every effort to inform its employees of its sexual harassment policy, and provided them several avenues to report

any such harassment. Colbert apparently claims that Georgia–Pacific and Williams intentionally inflicted emotional distress on her by failing to terminate Coley when they learned of Mayberry's complaint before Colbert began working at the plant. In essence, Colbert is trying to state a claim on Mayberry's behalf (the Court has previously discussed that neither Georgia–Pacific nor Williams knew of Coley's harassment of Colbert before her complaint).

Colbert has not presented the Court with any evidence showing that Georgia–Pacific or Williams intentionally or recklessly committed the acts of Coley which allegedly caused her emotional distress. *See Mackey v. U.P. Enterprises, Inc.,* 935 S.W.2d 446, 454–55 (Tex.App.—Tyler 1996, no writ). In any event, the defendants' alleged inaction, if any, is certainly far less egregious than other actions held not to constitute intentional infliction of emotional distress as a matter of law in sexual harassment cases. *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 193–95 (5th Cir.1996); *Gearhart v. Eye Care Centers of Am., Inc.,* 888 F.Supp. 814, 819–23 (S.D.Tex.1995); *Humphreys v. Medical Towers, Ltd.,* 893 F.Supp. 672, 679–81 (S.D.Tex. 1995), *aff'd,* 100 F.3d 952 (5th Cir.1996). The summary judgment evidence "does not demonstrate conduct and actions so unjustifiable, so uncivilized, so based on malice, or so senselessly destructive of another that it rises to the level of 'outrageous conduct' as that term relates to and describes the cause of action for intentional infliction of emotional distress." *MacArthur v. University of Tex. Health Ctr. at Tyler,* 45 F.3d 890, 899 (5th Cir.1995).

### Negligence

■■■ In her Complaint, Colbert recasts her sexual harassment allegations as a state law cause of action for negligence. Colbert alleges that Georgia–Pacific and Williams failed to take action to remedy the sexual harassment against Colbert after experiencing similar incidents with other female employees and Coley, and failed to alleviate the harassment by Coley after having notice of it. Colbert alleges that these actions clearly show a conscious indifference for her rights and constitute gross negligence.

The undisputed summary judgment evidence demonstrates that Georgia–Pacific has subscribed to and maintained Texas Workers' Compensation coverage at least since September 1991. Colbert's alleged injuries occurred within the course and scope of her employment with Georgia–Pacific. Colbert's negligence claims are preempted by the Texas Workers' Compensation Act ("TWCA"), Tex. Lab.Code Ann. § 408.001. This Act provides the exclusive remedy for injuries sustained by an employee in the course of her employment as a result of her employer's negligence. *Ward v. Bechtel Corp.,* 102 F.3d 199, 203 (5th Cir.1997). Recovery against Georgia–Pacific on Colbert's negligence claims is thus foreclosed by the TWCA.

As for her negligence claim against Williams, Colbert has not shown that he had any independent duty to her outside of his role as the Georgia–Pacific personnel manager so that he can be held individually liable. The Court has previously discussed Colbert's failure to raise a fact issue as to whether Georgia–Pacific or Williams had knowledge of any prior sexual harassment by Coley to Colbert before April 24, 1995, and has held that the company (including Williams) took prompt remedial action as soon as Colbert made her complaint. The Court grants summary judgment in favor of Williams on Colbert's negligence claim.

### Assault and Battery

Colbert alleged in her Complaint that Coley engaged in assault and battery against her by "threats of physical injury and job security if Plaintiff did not cooperate with his sexually oriented scheme" and that she was in fear of mental and physical injury. Colbert alleged that Coley committed these acts in his capacity as agent and/or employee of Georgia–Pacific.

In her deposition, Colbert acknowledged that no one at Georgia–Pacific authorized or directed Coley to engage in these acts constituting assault and battery, and that when Coley did so, he was not acting in furtherance of Georgia–Pacific's business or carrying out duties and responsibilities assigned to him by Georgia–Pacific. She agreed that the company in no way condoned or tolerated Coley's actions which constituted assault and battery. The Court concludes that Colbert has failed to raise an issue of material fact on her assault and battery claim, and grants summary judgment in favor of Georgia–Pacific on this claim.

### CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is **GRANTED**.